# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RALPH STROCCHIA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 2017 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ralph Strocchia ("Plaintiff"), seeks judicial review of a final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying him

disability insurance benefits ("DIB"). Before this Court is Plaintiff's Motion for Summary

Judgment. The parties have consented to have this Court conduct any and all proceedings in this

case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and N.D. Ill.

R. 73.1(c). For the reasons set forth below, this Court affirms the Commissioner's decision in

part, reverses in part, and remands the case for further proceedings consistent with this opinion.

## I.    Background

### A.    Procedural History

Plaintiff filed for DIB on February 13, 2006, alleging that he had become disabled on

October 15, 2003. (R. at 57, 59.) After the Social Security Administration ("SSA") denied his

application on May 19, 2006, he filed a request for reconsideration, which was denied on

September 13, 2006. (R. at 38, 44.) He then filed a timely request for a hearing before an administrative law judge ("ALJ"). (R. at 50.) On July 9, 2007, Plaintiff appeared with counsel at an administrative hearing before ALJ Robert M. Senander. (R. at 508). At the hearing, Plaintiff testified and, through counsel, amended his disability onset date to March 31, 2005. (R. at 511, 513.) Additional testimony was provided by Lee Knutson, a vocational expert ("VE"). (R. at 521.) The ALJ denied Plaintiff's claim on July 27, 2007. (R. at 35.) The Appeals Council of the Social Security Administration declined Plaintiff's request to review the case, making the ALJ's decision the final decision of the Commissioner. (R. at 6.) Plaintiff now appeals the decision to this Court.

### B.    Factual Background

#### 1.    Education and Work History

Plaintiff was born on August 20, 1951, making him fifty-three years old at the time of his alleged onset date. (R. at 511.) He is approximately six feet tall and weighs approximately 237 pounds. (R. at 512.) He lives in Melrose Park, Illinois, with his daughter and son-in-law. (*Id.*) He has no minor children and has been married twice: in 1972, to his first wife, who died in 1989; and in 1992, to his second wife, from whom he became divorced in 2005. (R. at 59-60.) He is a United States citizen with a twelfth-grade education (R. at 58, 91), and he has had no vocational training or military experience. (R. at 513.)

Plaintiff was unemployed in 1982 and again from 1984 to 1994. (R. at 64.) According to an SSA Work History Report, he worked full-time as an "asphalt helper" from 1995 to 2002. (R. at 311.) Plaintiff reported that the job involved walking approximately two hours a day,

standing two hours a day, and sitting four hours a day; it did not, however, require lifting, carrying, or supervising others. (*Id.*) From August 2002 to December 2003, Plaintiff did not work because he was in prison. (R. at 64.) Plaintiff then worked full-time as an "electrician helper" from November 2004 until his alleged onset date, October 15, 2003. (R. at 312; R. at 91; Def.'s Resp. 1.) According to Plaintiff, the electrician job involved changing light bulbs and walking throughout the day, but did not require lifting, carrying, or supervising others. (*Id.*)

### 2. Medical Evidence

In October 2003, while incarcerated at the Metropolitan Correctional Center in Chicago, Plaintiff had a heart attack and was sent to Northwestern Memorial Hospital. (R. at 29, 110.) He has since had three coronary stents implanted. (R. at 110.) Plaintiff claims that he began suffering from panic attacks after his heart attack for fear of having another. (*Id.*)

#### i. Medical History Prior to Amended Onset Date

On January 1, 2004, shortly after his release from prison, Plaintiff went to the emergency room at Northwest Community Hospital in Arlington Heights, Illinois, for chest pain. (R. at 343.) One month later, on February 4, 2004, Plaintiff went to the same emergency room for recurrent chest discomfort. (R. at 350.) The physician noted that the Plaintiff had visited the emergency room three times in the past five days because of the same complaint. (*Id.*) The

physician also noted that the Plaintiff recently began taking Paxil[1] and Xanax[2] for a possible anxiety disorder or for panic attacks. (*Id.*) On February 7, 2004, Plaintiff was once again admitted for recurrent chest discomfort, but the examining physician ruled out a heart attack. (R. at 348.)

The following month, on March 1, 2004, Plaintiff began visiting physician Mary A. Sandoval ("Dr. Sandoval") at Westside Medical Associates. (R. at 383.) Dr. Sandoval noted in the New Patient Assessment Form that Plaintiff's anxiety was in much better control with Paxil, and the physician's impression included coronary artery disease ("CAD")[3] with stents, hypertension,[4] hyperlipidemia,[5] and anxiety disorder. (R. at 383-84.) On March 11, 2004, the treatment plan included continuation of Paxil and a switch from Xanax to Zoloft.[6] (R. at 385.) On March 15, 2004, Plaintiff called in to the doctor to complain that he felt unable, and not mentally ready, to return to work. Dr. Sandoval advised him to take two weeks off. (R. at 381.) On April 22, 2004, Plaintiff's treatment plan remained the same. (*Id.*)

---

[1] Paxil is the trade name for paroxetine, an antidepressant. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1708 (18th ed. 2006).

[2] Xanax is the trade name for alprazolam, an anxiolytic. *Id.* at 1674.

[3] CAD involves impairment of blood flow through the coronary arteries. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY at 626.

[4] Hypertension means sustained elevation of resting blood pressure. *Id.* at 604.

[5] Hyperlipidemia describes elevation of blood cholesterol and/or triglycerides. *Id.* at 1296.

[6] Zoloft is the trade name for sertraline, an antidepressant. *Id.* at 1708.

Plaintiff's next visit was four months later, on August 13, 2004. (R. at 379.) He reported constant fatigue but did not complain of chest pain or wheezing. (*Id.*) Dr. Sandoval noted that Plaintiff was still smoking and was non-compliant with his recommended diet. (*Id.*) Dr. Sandoval also reported that Plaintiff was compliant with medication and was doing much better on Zoloft. (*Id.*) Dr. Sandoval's impression of Plaintiff now included Type 2 diabetes mellitus[7] and fatigue. (*Id.*) On August 24, 2004, Plaintiff complained of fatigue, lightheadedness, anxiety, and intermittent feelings of panic since his release from prison. (R. at 378.)

About three months later, on November 18, 2004, Dr. Sandoval noted that Plaintiff did not return for blood work, but lacked chest pain and was "doing very well overall." (R. at 376.) Dr. Sandoval noted that Plaintiff had gained weight, was not working, was eating excessively, and was still smoking. (*Id.*) Plaintiff also reported that he was doing well with Zoloft. (*Id.*)

The following month, on December 3, 2004, it was noted that Plaintiff was non-compliant with his recommended diet and that he was refusing medication. (R. at 377.) On December 17, 2004, Plaintiff was admitted to the emergency room at Good Samaritan Hospital after he experienced chest pain. (*Id.*) He was discharged four days later. (*Id.*) Six days after his discharge, on December 27, 2004, Plaintiff complained to Dr. Sandoval of anxiety and reported that he was taking Xanax, and that Zoloft did not relieve any symptoms. (R. at 374.) He also reported that he was still smoking, but that he was being more compliant with his recommended

---

[7] This condition occurs where there is impaired insulin secretion and peripheral insulin resistance leading to high blood glucose concentration. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY at 1274.

diet. (*Id.*) Plaintiff was given a psychiatric referral and advised to discontinue use of tobacco and Zoloft. (*Id.*)

On March 8, 2005, shortly before Plaintiff's amended onset date, Plaintiff complained of chest discomfort and anxiety, and his treatment plan included taking Paxil and Xanax. (R. at 375.)

ii. Medical Evidence Since Amended Onset Date

On April 5, 2005, Plaintiff complained of severe fatigue followed by anxiety and stated that he got relief from taking Xanax, but not Paxil. (R. at 372.) Plaintiff also reported that he had recently been admitted to the Elmhurst emergency room for chest pain. (*Id.*) Dr. Sandoval noted that Plaintiff was still smoking and referred him to a cardiologist and psychiatrist. (*Id.*) Dr. Sandoval also replaced Paxil with Wellbutrin.[8] (*Id.*)

More than two months later, on June 21, 2005, Plaintiff reported having seen Park Ridge psychiatrist Sandip Buch ("Dr. Buch"), who prescribed him Xanax and Paxil. (R. at 370.) Plaintiff told Dr. Sandoval that he was doing much better on those medications. (*Id.*) Plaintiff continued to see Dr. Sandoval, who noted that Plaintiff refused to stop smoking and was non-compliant with his recommended diet. (*Id.*)

Seven months later, on January 30, 2006, Plaintiff went to the emergency room at Gottlieb Memorial Hospital after experiencing dyspnea.[9] (R. at 405-06.) The physician noted

---

[8] Wellbutrin is the trade name for bupropion, an antidepressant. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY at 1709.

[9] Dyspnea describes unpleasant or uncomfortable breathing. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY at 357.

that Plaintiff appeared pleasant, was not visibly distressed, and had no chest pain, diaphoresis, headache, dizziness, nausea, or vomiting. (*Id.*) The doctor concluded that the anxiety attack that Plaintiff experienced was unlikely to be of cardiac or pulmonary origin, and he was discharged the next day. (R. at 398, 406.)

a.      Bureau of Disability Determination Services

On April 8, 2006, physician Mahesh Shah ("Dr. Shah") performed an Internal Medicine Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. at 418.) Dr. Shah reviewed all the information on Plaintiff's history that was sent to him by the DDS, and he noted that Plaintiff was alleging disability due to anxiety, depression, and CAD. (*Id.*) Dr. Shah also noted that Plaintiff had exhibited no cardiac chest pain since December 2004, and that his three hospitalizations after his release from prison were unrelated to his heart problems. (*Id.*) Nevertheless, Plaintiff worried that his symptoms reflected problems with his heart. (*Id.*) Plaintiff complained of fatigue and depressed mood. (*Id.*) Dr. Shah noted that Plaintiff was mildly anxious, cooperative, attentive, alert, and oriented. (R. at 419-20.)

Furthermore, Dr. Shah described Plaintiff's speech, memory, appearance, behavior, and ability to relate as normal, and noted that he was able to move around without difficulty. (*Id.*) Dr. Shah indicated that, although Plaintiff looked depressed, "his mental status seem[ed] to be quite normal." (R. at 421). Dr. Shah's impression consisted of (1) CAD with stents (stable); (2) anxiety and depression; (3) hypertension (good control with medication); (4) diabetes (good control with medication); and (5) elevated lipids (on medication). (*Id.*)

Six days later, on April 14, 2006, physician John W. O'Donnell ("Dr. O'Donnell") completed a Psychiatric Evaluation of Plaintiff for the DDS. (R. at 422.) Dr. O'Donnell noted that he did not receive from the DDS any information about Plaintiff for review. (*Id.*) During the evaluation, Plaintiff complained of becoming depressed, as well as being anxious on a daily basis. (R. at 423, 425.) He reported waking up nervous, with his symptoms gradually subsiding. (R. at 423.) He also reported that his anxiety was triggered around midday, as well as by noise or too much activity—particularly when he gets tired or when he visits his grandchildren. (*Id.*) Plaintiff went on to report that his anxiety can be triggered at home or elsewhere, claiming that "[e]verything just bother[ed him]," and that he "just want[ed] to be alone." (R. at 423, 425.) Plaintiff reported that he would lie down, sit down, and/or take Xanax to alleviate his symptoms. (R. at 423.)

Plaintiff also reported to Dr. O'Donnell that he had suffered a few anxiety attacks, some of which led to shortness of breath and heart palpitations that made him feel like he was having a heart attack. (*Id.*) Plaintiff did indicate, however, that these symptoms "ha[d] not happened in a while." (*Id.*) Plaintiff reported that he first received psychiatric treatment while he was in prison–August or September 2003–and was prescribed Wellbutrin. (*Id.*) He reported going to a psychiatrist once a month since February or March of 2004. (*Id.*) Plaintiff denied having sleep problems, suicidal ideation, delusions, or hallucinations. (R. at 423, 425.) Plaintiff indicated to Dr. O'Donnell that he would not be able to work because of anxiety. (R. at 424.) Plaintiff also stated that he felt "[g]ood, but nervous about coming [to the examination]." (R. at 425.)

In his evaluation, Dr. O'Donnell noted that Plaintiff's affect varied, but that he was mildly anxious throughout the examination. (*Id.*) Plaintiff had good attitude, eye contact, and

relevance. (*Id.*) Plaintiff was also reliable, friendly, cooperative, pleasant, alert, and oriented. (R. at 422, 425-26.) Plaintiff had a "nice, appropriate smile [and] light appropriate laugh," and was not restless, distractible, or hypervigilant. (R. at 425.) Plaintiff's speech was spontaneous, coherent, productive, and of normal rate and volume. (*Id.*) Furthermore, although his form of thought was sometimes vague, Plaintiff did not appear to be responding to inner stimuli and had no unusual emotional reactions, flight of ideas, or disturbance in perception or thought content. (*Id.*) Dr. O'Donnell concluded his evaluation by indicating that the prognosis of Plaintiff's condition was "guarded." (R. at 427.)

Ten days later, on April 24, 2006, Dr. Buch, who Plaintiff had been visiting approximately once a month since May 2005 (R. at 429), completed a Psychiatric Report on Plaintiff for the DDS (R. at 429-32). Dr. Buch described Plaintiff's affect as full and engaged, and his speech rate as regular. (R. at 430.) Plaintiff had no delusions or mood complaints when lacking anxiety. (*Id.*) Plaintiff's anxiety and panic attacks had interfered with his ability to work in the past, but he had been able to work when his symptoms were controlled. (R. at 429.) Dr. Buch noted the diagnosis as generalized anxiety disorder and panic disorder without agoraphobia. (R. at 432.) Dr. Buch indicated that when not anxious, Plaintiff can "do work-related activities, such as understand, carry out, and remember instructions[; and] respond appropriately to supervision, co-workers, and customary work pressures." (*Id.*) Dr. Buch concluded by reporting that Plaintiff's "symptoms are [currently] controlled by medication—even breakthrough periods of anxiety . . . . However, [Plaintiff] is not working. If he was working, anxiety may be worse." (*Id.*)

The next month, on May 9, 2006, state-agency psychologist Donald Cochran, Ph.D ("Dr. Cochran"), completed a Psychiatric Review Technique Form after reviewing Plaintiff's record. (R. at 434.) Dr. Cochran assessed Plaintiff as having (1) moderate restrictions on activities of daily living ("ADL"); (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation. (R. at 444.) Dr. Cochran noted that Plaintiff could function when not anxious, and that his symptoms were controlled with medication. (R. at 446.) Dr. Cochran reported that Plaintiff's memory, understanding, and ability to follow instructions were not problems, and that he "retain[ed] the mental capacity to do simple work-related tasks." (R. at 446.)

Dr. Cochran also performed a Mental Residual Functional Capacity ("RFC")[10] Assessment of Plaintiff. He noted that Plaintiff had no significant limitations in understanding, memory, and adaptation. (R. at 448-49.) He also noted that Plaintiff was "moderately limited" in some aspects of sustained concentration and persistence: (1) the ability to carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; (3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (4) the ability to work in coordination with or proximity to others without being distracted by them. (R. at 448.) He had no significant limitations, however, in (1) the ability to carry out very short and simple instructions, (2) the ability to sustain an ordinary routine without special supervision, (3) the ability to make simple work-related decisions, and (4) the ability to complete a normal workday and workweek without interruptions

---

[10] The RFC is the maximum that a claimant can still do despite his physical and mental limitations. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 448-49.) In terms of social interaction, Dr. Cochran found Plaintiff to be moderately limited in the ability to interact appropriately with the general public, but not significantly limited in the ability to ask simple questions; request assistance; accept instructions or respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (R. at 449.)

Three days later, on May 12, 2006, physician Virgilio Pilapil ("Dr. Pilapil") completed a Physical RFC Assessment of Plaintiff. (R. at 452.) Dr. Pilapil indicated that Plaintiff could (1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday, and (4) sit for a total of six hours in an eight-hour workday. (R. at 453.) Plaintiff had not established postural, manipulative, visual, communicative, or environmental limitations. (R. at 453-56.) Dr. Pilapil concluded by noting that Plaintiff's CAD appeared stable, his hypertension and diabetes were under good control with medication, and there was no evidence of chest pain. (R. at 459.)

b.    Jean Mays and Dr. Dwivedi

On July 20, 2006, Plaintiff began seeing Jean Mays ("Mays"), a licensed clinical social worker, at Resurrection Behavioral Health to seek relief of several symptoms. (R. at 197.) Plaintiff reported that he had a history of chest heaviness, elevated pulse rate, and shortness of breath. (R. at 198.) He also reported that he had lost consciousness on multiple occasions, and

that he had been suffering from extreme fatigue. (*Id.*) Plaintiff stated that he suffered from extreme nervousness and approximately two panic attacks per week, but that he was "fairly confident" that he could distinguish between panic attack symptoms and heart-attack symptoms. (R. at 198.) Plaintiff also reported that he wanted to "blow his brains out" two weeks prior to his first visit with Mays, but stated during the assessment that, although he passively thought of death, he would never kill himself. (*Id.*)

Furthermore, Plaintiff informed Mays that he had previously seen the prison psychiatrist for panic disorder, for which he was prescribed Wellbutrin. (*Id.*) Mays also was informed that Plaintiff saw Dr. Buch from March 2004 to February 2006 for panic disorder, and that Dr. Buch prescribed him Xanax and paroxetine. (R. at 198.) Mays gave Plaintiff a Global Assessment of Functioning ("GAF") score of 49.[11] (R. at 199.) Mays' treatment plan was for "[s]hort-term, individualized mental health treatment to enhance and build on coping strategies to manage symptoms of anxiety." (*Id.*) Specifically, she recommended that Plaintiff undergo a psychiatric evaluation, receive individual therapy or counseling, and manage his symptoms with medication. (*Id.*)

Eight days after his first visit with Mays, on July 28, 2006, Plaintiff was brought by ambulance to the emergency department at Loyola University Health for chest pain. (R. at 120.) The attending physician noted that Plaintiff was sweating, but had no acute distress or shortness of breath. (R. at 121.) Plaintiff belligerently refused admission to the hospital and was willing to

---

[11] The GAF scale reports a "clinician's assessment of the individual's overall level of functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 1994). A GAF score between 41 and 50 reflects serious symptoms or "any serious impairment in social [or] occupational . . . functioning." *Id.* at 32.

leave against medical advice. (*Id.*) Plaintiff was stable at discharge, and the radiologist reported that his cardiac and pulmonary results were normal. (R. at 121, 132.) Two days later, on July 30, 2006, Plaintiff was admitted to the emergency department at Westlake Hospital after fainting. (R. at 463.) Plaintiff reported that for the past several weeks, he had intermittently felt lightheaded. (R. at 466.) A chest radiograph and a CT scan yielded normal results. (R. at 476-77).

Yet three days later, on August 2, 2006, Plaintiff called Resurrection Behavioral Health's Helpline Services, stating, "I don't feel good. I wish I could just die." (R. at 167.) Plaintiff also reported that he had "fleeting thoughts of taking pills" but had no intent to do so. (*Id.*) When the social worker called him back two hours later, Plaintiff "seemed much calmer" and acknowledged that he was "feeling much better." (R. at 168.) The next day, Plaintiff saw Mays, who reported that his mood and functioning had worsened since his last visit and described his affect as tearful, sad, and angry. (R. at 164.) Mays noted that Plaintiff was struggling with "disabling symptoms of depression and anxiety," and was having obsessive thoughts of anger and frustration towards his ex-wife. (*Id.*) Mays' diagnosis of Plaintiff was major depressive disorder, single episode, moderate. (*Id.*)

On August 17, 2006, Plaintiff reported that his mood and functioning had improved because of treatment. (R. at 160.) He informed Mays that he had enjoyed a family outing despite his fear of having a panic attack in a crowd. (*Id.*) Mays described his affect as "bright," and she advised him to continue with the treatment plan. (R. at 161.) On the same day, Plaintiff began seeing psychiatrist Sanjgen Dwivedi ("Dr. Dwivedi"). (R. at 148.) Plaintiff informed Dr. Dwivedi that he was suffering from panic disorder and anxiety, for which he had been

prescribed Xanax and Paxil since 2003. (*Id.*) Plaintiff also reported feeling suicidal once, but that he did not have recurrent suicidal ideation. (*Id.*) Dr. Dwivedi noted that Plaintiff did not have hallucinations, nor was there evidence of psychosis. (R. at 149.) Furthermore, Dr. Dwivedi described Plaintiff as alert and oriented; his mood, affect, and speech as normal; and his insight and judgment as good. (*Id.*) Dr. Dwivedi assigned Plaintiff a GAF score of 70[12] and advised that he continue with medication and cognitive behavioral therapy ("CBT"). (R. at 149-50.)

The following month, on September 7, 2006, Mays noted that Plaintiff was again admitted to Westlake Hospital from September 4 to 6 for a panic attack. (R. at 162.) Plaintiff had expressed fears of having a heart attack, but physicians at Westlake advised him that his symptoms, including chest palpitations, chest pain, and shortness of breath, were caused by anxiety. (*Id.*) Plaintiff denied suicidal ideation, but reported the same obsessive thoughts about his ex-wife and expressed concern over possibly assaulting his ex-wife's partner. (*Id.*) Mays described his affect as fearful and added relaxation and mindfulness techniques to his treatment plan. (*Id.*)

A week later, on September 14, 2006, Plaintiff saw Dr. Dwivedi and reported the same anxiety and panic symptoms, which he said felt, for ten minutes, like he was going to have a heart attack. (R. at 153.) He reported the same obsessive thoughts about his ex-wife. (*Id.*) Because of his last panic attack at the hospital, the prescribed dosage of Xanax was increased. (*Id.*) Dr. Dwivedi noted that he had reviewed the side effects of Paxil and Xanax on Plaintiff,

---

[12] A GAF score between 61 and 70 indicates that the individual has mild symptoms or "some difficulty in . . . functioning, but [is] generally functioning pretty well." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 1994).

and added trazodone[13] to his medications. (*Id.*) Dr. Dwivedi advised Plaintiff to continue CBT for panic disorder. (*Id.*)

Another week later, on September 21, 2006, Plaintiff saw Mays, who noted that he had been in the emergency room five times in two months because of panic symptoms. (R. at 158.) Plaintiff reported feeling "drunk or high" when taking trazodone, the discontinuance of which Dr. Dwivedi authorized for that night. (*Id.*) Plaintiff again denied suicidal ideation but expressed the same thoughts regarding his ex-wife and her partner. (*Id.*) Plaintiff also reported that, because of treatment, the frequency of panic symptoms improved from once every two hours to once every day. (*Id.*) Mays described Plaintiff's affect as anxious and agitated, listed the diagnosis as panic disorder without agoraphobia, and advised continuation with the treatment plan. (*Id.*)

The following month, on October 12, 2006, Plaintiff saw Dr. Dwivedi and reported that he had anxiety but no panic attacks or depression. (R. at 152.) Furthermore, he was not using coping skills or challenging his negative thoughts, but he was compliant with his medication, was sleeping well, and had a normal appetite. (*Id.*) Dr. Dwivedi assigned Plaintiff a GAF score of 60 and noted that he was alert, oriented, and had normal eye contact, mood, affect, and speech. (*Id.*) Dr. Dwivedi discussed coping skills and CBT with Plaintiff and advised that he continue his medication, with the exception of trazodone. (*Id.*)

A month later, on November 9, 2006, Plaintiff reported to Dr. Dwivedi that he had decreased anxiety, no panic attacks, and no symptoms of depression. (R. at 151.) He also

---

[13] This is a drug with antidepressant and anxiolytic effects. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY at 1709.

reported that he was sleeping well and was not experiencing any side effects from Paxil. (*Id.*) Dr. Dwivedi assigned Plaintiff a GAF score of 70 and advised that he continue with medication and CBT. (*Id.*)

On November 30, 2006, Plaintiff reported to Mays that he had fewer panic symptoms and fewer obsessive thoughts about his ex-wife. (R. at 180.) Although he was anxious about the holiday, he "had a good time with [his] family." (*Id.*) Mays noted that Plaintiff was compliant with paroxetine and Xanax. (*Id.*) Mays noted the Plaintiff's need for therapy to enhance coping skills for anxiety management. (*Id.*) On the same day, Dr. Dwivedi completed a Mental Disorders Report on Plaintiff. (R. at 146.) Dr. Dwivedi diagnosed Plaintiff as having panic disorder and depression. (*Id.*) Dr. Dwivedi noted that Plaintiff did well with his family, but experienced "occasional anxiety" outside his home. (*Id.*) It was noted that panic disorder and depression restrict Plaintiff's daily activities, particularly participation in social events. (*Id.*) It also was noted that these illnesses affect Plaintiff's concentration and attention span, so that he is often unable to complete tasks, especially when anxious. (R. at 147.) Dr. Dwivedi reported that Plaintiff lived in a "highly supportive and protective setting that helps attenuate some of the more severe symptoms" and indicated that Plaintiff may become more anxious if he lived alone. (*Id.*) Dr. Dwivedi indicated that Plaintiff is "not able to function in a competitive work setting" on a full-time basis. (*Id.*) Dr. Dwivedi concluded by noting that Plaintiff continued to have anxiety and undergo therapy. (*Id.*)

Two weeks later, on December 14, 2006, Plaintiff reported to Dr. Dwivedi that he had a single panic attack since his last visit, had found the holidays to be stressful, had some mild depression, and had dreams of his deceased wife. (R. at 206.) Plaintiff has no sleep problems or

suicidal ideation. (*Id.*) Dr. Dwivedi described Plaintiff's mood, affect, and speech as normal, and Plaintiff was assigned a GAF score of 70. (*Id.*) The treatment plan was to continue with medication and CBT. (*Id.*)

The following month, on January 25, 2007, Plaintiff reported to Mays that, for two weeks prior, he experienced an increase in anxiety symptoms, including chest palpitations, shortness of breath, faintness, and obsessive thoughts about his ex-wife. (R. at 176.) Mays described Plaintiff's affect as anxious and noted that Plaintiff needed to continue with therapy. (*Id.*) On the same day, he saw Dr. Dwivedi, who advised him of coping skills. (R. at 205.) The treatment plan was to continue with medication and CBT, and Dr. Dwivedi assigned Plaintiff a GAF score of 70. (*Id.*)

The following month, on February 15, 2007, Plaintiff visited Dr. Dwivedi, who again assigned him a GAF score of 70 and described his mood, affect, and speech as normal. (R. at 204.) On March 1, 2007, Plaintiff reported to Mays that he continued to have symptoms of anxiety and depression. (R. at 174.) He also reported that he continued to have panic symptoms, especially in crowds. (*Id.*) Since Dr. Dwivedi increased his prescribed dosage of Paxil two weeks prior, however, Plaintiff acknowledged that his panic symptoms have decreased with medication. (*Id.*) Mays described Plaintiff's affect as appropriate and advised him to continue with relaxation techniques. (*Id.*)

Two weeks later, on March 15, 2007, Plaintiff reported to Mays that he continued to have symptoms of anxiety and depression (R. at 172.) Plaintiff also reported that aside from the obsessive thoughts about his ex-wife, he also had obsessive thoughts about potentially meeting and acting violently against his ex-wife's partner. (*Id.*) Mays noted that Plaintiff remained

compliant with medication but attended therapy sporadically. (*Id.*) She described Plaintiff's affect as appropriate and noted that he needed to continue with therapy. (*Id.*)

The following month, on April 12, 2007, Mays noted that Plaintiff's anxiety and depressive symptoms were related to several events throughout his history, including his heart attack, his mother's fatal car accident, his first wife's death, and his divorce. (R. at 275.) Plaintiff reported that he still became anxious before social events and that he still had obsessive thoughts about his ex-wife and harming her partner. (*Id.*) He also reported, however, that he was able to go to an event despite suffering anxiety about potentially encountering his ex-wife there. (*Id.*) Additionally, he expressed understanding that harming his ex-wife's partner "would not be in his best interest." (*Id.*) Furthermore, he reported that his panic attacks and obsessive thoughts had generally decreased, he was reasonably content with the improvements he was experiencing, and he was willing to consider alternatives to aggressive or harmful behavior. (*Id.*) Mays noted that Plaintiff had been compliant with his medication and described his affect as appropriate. (*Id.*) Mays listed the diagnosis as "major depressive disorder, recurrent, moderate" and advised Plaintiff to continue therapy. (*Id.*)

On the same day, Plaintiff reported to Dr. Dwivedi that he felt anxious, shaky, and nervous before appointments and social events, but that he had experienced improvements in anxiety and panic symptoms because of medication and therapy. (R. at 277.) He reported no depression, suicidal ideation, or sleep problems. (*Id.*) Dr. Dwivedi listed his goals as living independently, having a job, and decreasing his obsessive thoughts. (*Id.*) Plaintiff did not want an increase in the dosage of Paxil, but reported that he increased his use of Xanax to alleviate

anxiety. (*Id.*) Dr. Dwivedi assigned Plaintiff a GAF score of 70 and described him as alert, cooperative, and with normal affect. (*Id.*)

### C.   Plaintiff's Testimony

At a hearing before the ALJ on July 9, 2007, Plaintiff testified to his employment history, ADL, and symptoms and limitations affecting his ability to work. (R. at 508-40.) Plaintiff testified that he had not earned any money by working since the amended onset date. (R. at 514.) He stated that he worked as an electrical helper for the University of Chicago from December 2004 to March 2005. (*Id.*) He testified that although his job involved changing light bulbs, he never climbed a ladder or changed a light bulb, as he convinced a younger colleague to do the work in exchange for lunch. (R. at 517.) He also stated that he worked as an asphalt helper for the City of Chicago from July 1997 to September 2001. (R. at 515.) When asked by counsel regarding the nature of the job, Plaintiff replied, "I did whatever I wanted . . . . I never even had to get out of the truck. I never touched a shovel of asphalt. . . . [T]here was another job making thirty-something dollars an hour doing absolutely nothing." (R. at 524.) Plaintiff further testified that for twenty years, he worked for bookmakers, answering phones and taking bets. (R. at 515-16.) He agreed with the ALJ that it was a "sedentary-type job." (R. at 516.)

As for his ADL, Plaintiff testified that he did not think he could cope with living independently, as he did not know how to cook, shop, or do laundry. (R. at 538.) He also stated that his daughter had to remind him to take his medication and keep his appointments because he was forgetful. (R. at 537.)

Regarding his medical impairments, Plaintiff testified that he got panic attacks "constantly." (R. at 518.) He stated that he suffered from nervousness, poor memory, poor concentration, and an inability to follow orders. (*Id.*) He testified that whenever he felt anxiety symptoms coming on, he would have to sit down, take Xanax, and avoid talking to anyone. (R. at 519.) He stated that his medications caused fatigue and drowsiness. (R. at 534.) When his counsel informed the ALJ that he also suffered from hypertension, diabetes, depression, and CAD, Plaintiff added that his hypertension aggravated his anxiety, he was taking medication for his diabetes, and he had no numbness or problems with his eyesight, hands, or feet. (R. at 519-20.)

When asked by counsel to elaborate on his experiences with anxiety and panic attacks, Plaintiff testified that he first felt the symptoms after having a heart attack in jail: "I must have passed out ten times in prison[] from panic attacks." (R. at 525-26.) He testified that he was prescribed nitro-pills for his heart condition while in prison, but he took a pill only once. (R. at 535.) He stated that during a panic attack, he would sweat profusely and feel his heart palpitate. (R. at 526.) He further testified that on multiple occasions, his panic attacks led to fainting, so that he had to go to the hospital. (*Id.*) Although physicians had informed him that his heart was fine and that they believed he was suffering from panic disorder, Plaintiff stated that he was unable to distinguish between heart-attack symptoms and panic-attack symptoms. (R. at 526-27.)

Plaintiff further stated that he had obsessive thoughts and his sleep had been interrupted every hour. (R. at 527, 534.) He testified that his anxiety could be triggered by positive or negative events, such as being invited to a gathering or preparing for the administrative hearing. (R. at 527.) He also testified that aside from sitting and taking medication, he would pray to

alleviate his symptoms, and it would take between ten and fifteen minutes for his symptoms to subside. (R. at 529.) When Plaintiff testified that he had an anxiety attack approximately three or four times a week, the ALJ pointed out that there was evidence of only three panic attacks in a two-year period. (*Id.*) Plaintiff explained that those three instances on the record were the "particularly bad" panic attacks that led him to believe he was having a heart attack and consequently faint. (*Id.*)

When asked by counsel what he did whenever he got anxious someplace other than home, such as a job site, Plaintiff testified that he would just have to leave in order to be alone and avoid other people. (R. at 530.) Plaintiff added that he also removed himself from noisy environments because they remind him of prison. (R. at 531.) Plaintiff testified that he was generally uncomfortable being around a lot of people and also had problems with others telling him what to do. (R. at 531-32.) He stated that he had a very short temper, explaining that he once slapped and threatened to punch a man who berated him for bringing fifteen items into a ten-item line at the grocery store. (R. at 532-33.)

He further testified that he would not respond well to a supervisor giving him instructions or negative feedback. (R. at 533.) He also would have "severe problems" with a coworker criticizing him or even simply tapping an item on a table: "I'd tell him either stop tapping . . . or I'm going to tap your forehead on the table." (*Id.*) Plaintiff added that he did not believe he could work in customer service or telephone solicitation. (R. at 539.) He admitted to being rude and abusive to telemarketers and testified that, if he were to work in customer service, he would "probably" act in a similar manner towards a customer who had a complaint. (R. at 539-40.)

## D.     VE's Testimony

After hearing Plaintiff's testimony, VE Lee Knutson also testified at the hearing. (R. at

521, 540.) The VE stated that Plaintiff's prior work as an electrical helper was "just called labor"

and that Plaintiff performed it at the light range. (R. at 522.) The VE further explained that it

was classified as such because Plaintiff still had to stand and walk even though he did not do so

often. (*Id.*) The VE also testified that, although Plaintiff's prior work as an asphalt helper would

usually be classified as heavy or very heavy unskilled work according to the Dictionary of

Occupational Titles ("DOT"), it was medium unskilled work as it was actually performed by

Plaintiff. (*Id.*) Furthermore, the VE classified Plaintiff's bookmaking job as semi-skilled and

sedentary, and described it as very similar to customer service as it was actually performed.

(R. at 523.) When asked by the ALJ whether Plaintiff had transferable skills, the VE stated that

Plaintiff could work in telephone solicitation or customer service at a sedentary level. (*Id.*)

The ALJ then described Plaintiff's residual functional capacity ("RFC") as follows:

(1) occasionally lifting twenty pounds, (2) frequently lifting ten pounds, (3) sitting or standing for

six hours in an eight-hour workday, (4) one-, two-, or three-step jobs, and (5) limited contact

with the general public. (R. at 540.) When asked by the ALJ whether the Plaintiff could perform

his past relevant work with this RFC, the VE opined that he could perform the unskilled labor

that he had done in the past. (*Id.*) The VE added that he would rule out the customer service job.

(*Id.*) The ALJ then asked the VE what other jobs in the national or regional economy could be

performed by a hypothetical individual with the same age, education, and RFC as Plaintiff. (R. at

541.) The VE testified that in the Chicago metropolitan area, such a hypothetical individual

would be able to perform the following light, unskilled jobs: 23,250 light assembly jobs; 15,250

light machine tending jobs; 7,000 inspecting, checking, and weighing jobs; and 16,000 packing/light packing jobs. (R. at 541-42.) The ALJ then asked whether the VE's answers were consistent with the DOT, and the VE answered in the affirmative. (R. at 542.)

Plaintiff's counsel then cross-examined the VE. (*Id.*) The VE testified that all the jobs that he identified required supervision, but that the overall foreman would not always be present to give out assignments. (*Id.*) When asked by counsel whether someone who could handle only limited supervision would be able to perform those jobs, the VE replied that conflicts or arguments with the supervisor would not be tolerated. (R. at 542-43.) When asked by counsel about the extent to which an employee must remain on task, the VE testified that an individual who is on task less than eighty-five to ninety percent of the time would be terminated. (R. at 544.) Counsel then asked whether an individual who took frequent unscheduled breaks due to a panic disorder would be terminated, and the VE answered in the affirmative. (R. at 545.) Furthermore, the VE testified that taking low tolerance to noise into consideration reduces the number of available jobs by fifty percent. (R. at 546.) Finally, the VE testified that an individual who had more than three absences a month would not be able to retain a job. (*Id.*)

### E. ALJ's Findings

In an opinion dated July 27, 2007, the ALJ made the following findings of fact:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

* * * *

2. The claimant has not engaged in substantial gainful activity since the alleged amended onset, March 31, 2005 . . . (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

\* \* \* \*

3. The claimant has the following severe impairments: [a]ffective mood disorder and hypertension with no end organ damage (20 CFR 404.1520(c) and 416.920(c)).

\* \* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

\* \* \* \*

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light work unskilled 1,2,3-step jobs, limited contact with general public (20 CFR 404.1545 and 416.945).

\* \* \* \*

6. The claimant is not credible (SSR 96-7p).

\* \* \* \*

7. The claimant is capable of performing past relevant work as a laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

\* \* \* \*

8. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2005, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. at 29-35.)

## II.    <u>Standard of Review</u>

This Court will affirm the ALJ's decision if it "is both supported by substantial evidence and based on the proper legal criteria." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court views the record in its entirety, but it does not reweigh the evidence or substitute its judgment for the judgment of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).

In addition, regardless of whether there exists sufficient evidence in the record to support the ALJ's decision, the ALJ is required to "'build an accurate and logical bridge'" from the evidence to his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). In doing so, the ALJ need not evaluate in writing every piece of evidence and testimony. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). The ALJ, however, must articulate his analysis at a minimal level. *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). This means that the ALJ cannot ignore an entire line of evidence that does not support his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Rather, the ALJ is required to "confront [such] evidence . . . and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). If the decision does not meet the minimum requirements because it "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,'" this Court will remand the case. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting *Steele*, 290 F.3d at 940).

### III.  Discussion

In order to qualify for DIB, a claimant must demonstrate that he is disabled.  An individual is considered to be disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A).  A claimant is considered to be "unable to engage in substantial gainful activity" when she is unable to perform her previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled under the statute, the ALJ employs a five-step, sequential-evaluation process. 20 C.F.R. § 404.1520(a)(4) (2009). The first step considers whether the claimant is engaging in substantial gainful activity. *Id.* The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. *Id.* The third step compares the impairment to a list of impairments that are considered conclusively disabling. *Id.* If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation proceeds to step four. *Id.* The fourth step assesses the applicant's RFC and ability to engage in past relevant work. *Id.* If an applicant can engage in past relevant work, she is not disabled. *Id.* If the applicant cannot engage in past relevant work, the fifth step assesses whether she can engage in other work in light of her RFC, age, education, and work experience. *Id.*  The claimant has the burden of proof as to the first four steps, while at the fifth step, the burden shifts to the Commissioner to show that the claimant's

RFC allows him to do some work within the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date. (R. at 29.) While the ALJ found that Plaintiff's impairments were "severe" enough to proceed to the third step of the evaluation, the ALJ determined at the third step that the impairments did not meet or medically equal one of the impairments listed in the SSA's regulations. (R. at 30.) At the fourth step, the ALJ found that Plaintiff retained the RFC "to perform the full range of light work unskilled 1,2,3-step jobs, limited contact with general public," and that Plaintiff was capable of performing his past relevant work as a laborer, which does not require the performance of work-related activities precluded by Plaintiff's RFC. (R. at 32, 35.) Because the ALJ found that Plaintiff could still perform his past relevant work, Plaintiff was found not to be disabled under the Social Security Act, and it was not necessary for the ALJ to proceed to the fifth step. (R. at 35.)

Plaintiff challenges the ALJ's decision on several grounds. First, he argues that the ALJ violated Social Security Ruling ("SSR") 96-2p by not giving controlling weight to or considering an alternative weight assignment for the opinion of Dr. Dwivedi, a treating medical source. (Pl.'s Mot. 7-9.) Second, Plaintiff argues that the ALJ erred at step four for three reasons. First, the ALJ violated SSR 82-62 by failing to identify the mental demands required of his past relevant work and address whether his mental limitations are compatible with these demands. (Pl.'s Mot. 9-10.) Second, the ALJ violated SSR 85-15 by failing to make a function-by-function assessment of his ability to perform basic work-related activities. (Pl.'s Mot. 10-11.) Third, Plaintiff argues that the ALJ's failure to include the DOT codes for the jobs referenced by the VE

precludes determination of (1) the compatibility between those jobs and the Plaintiff's functional limitations and (2) any conflicts between the jobs referenced and the DOT. (Pl.'s Mot. 10.) This Court finds that the ALJ was not required to include the DOT codes for the jobs referenced by the VE or a written function-by-function assessment in his decision, but that he failed to properly articulate his reasoning behind the weight he accorded to Dr. Dwivedi's opinion, and did not sufficiently compare the demands of Plaintiff's past relevant work with his existing mental limitations. Accordingly, the Court reverses and remands for further proceedings.

### A.    Weight of the Evidence and the Treating Physician

Plaintiff argues that the ALJ committed a reversible error by not according controlling weight, or any weight at all, to the opinion of Dr. Dwivedi, who was Plaintiff's treating physician. (Pl.'s Mot. 7-9.) In weighing medical opinions, an ALJ must evaluate every medical opinion he receives, 20 C.F.R. § 404.1527(d), and accord the treating physician's opinion controlling weight "on the issue(s) of the nature and severity of [the claimant's] impairment(s) [only if the opinion] is well-supported by medically acceptable clinical and laboratory diagnostic techniques[,] and is not inconsistent with the other substantial evidence in [the] case record." *Id.*; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Johansen*, 314 F.3d at 287-88; SSR 96-2 (stating, among other requirements, that the "[c]ontrolling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques," and that "[i]f a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given

controlling weight; i.e., it must be adopted").[14]  In other words, a physician's testimony is not

controlling merely by virtue of her status as a "treating physician"; the Commissioner makes the

ultimate disability determination based on the strictures of the law. *Johansen*, 314 F.3d at

287-88.

In addition, an ALJ should rely on medical opinions that are "based on objective

observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice*

*v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  This means that an ALJ may discount a treating

physician's opinion if it is based solely on such subjective complaints.  *Ketelboeter v. Astrue*, 550

F.3d 620, 625 (7th Cir. 2008).  If, however, a claimant presents medical evidence that establishes

an underlying impairment, subjective symptoms of that impairment may not be discredited

"merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d

751, 753 (7th Cir. 2004).  In *Carradine*, which involved a claimant with a psychiatric disorder,

the Seventh Circuit further held that "subjective, nonverifiable complaints are in some cases the

only symptoms of a serious medical condition.  To insist in such a case . . . that the subjective

complaint . . . is insufficient . . . would place a whole class of people outside the protection of

[the] law." *Id.*

The ALJ, of course, can reject these subjective complaints if she articulates logical

reasons for doing so. *See id.* at 754-55 ("The administrative law judge thought that [the claimant]

was exaggerating her pain-that it was not severe enough to prevent her from working. Ordinarily

this determination would be conclusive upon us, but in this case the administrative law judge

---

[14] SSRs are binding on the Social Security Administration. *Prince v. Sullivan*, 933 F.2d
598, 602 (7th Cir. 1991).

based his credibility determination on *serious errors in reasoning rather than merely the demeanor of the witness*, and when that occurs, we must remand.") (emphasis added). In other words, the decision regarding whom to believe rests with the ALJ, as long as that decision is supported by substantial evidence. *Dixon*, 270 F.3d at 1178. To discount a treating physician's opinion, however, the same rule applies: the ALJ must explain how substantial evidence in the record contradicts this opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Merely summarizing the evidence, *Ray v. Bowen*, 843 F.2d 998, 1003 (7th Cir. 1988), or simply citing the regulations governing an issue, *Steele*, 290 F.3d at 942, do not suffice.

In this case, the ALJ accorded "significant weight . . . to medical opinions on issues reserved to the Commissioner from acceptable medical sources," but declined to give controlling weight or "much weight at all" to the opinion of Dr. Dwivedi because he "appears to have accepted . . . [Plaintiff's] subjective complaints at face value in forming [his] opinion." (R. at 34.) The ALJ found Dr. Dwivedi's opinion was "not well supported by medical evidence and is not consistent with other substantial evidence of record." (*Id.*) To the extent that Dr. Dwivedi opined that Plaintiff was not able to function in a competitive work setting on a full-time basis, the ALJ was entitled to discount that particular opinion and instead rely on the opinions of Dr. Buch, who opined that Plaintiff could do mental work-related activities when not anxious, and of the DDS medical experts, who opined that Plaintiff was capable of performing a full or wide range of light work. This is because, as the ALJ stated, the determination of Plaintiff's ability to work, and the credibility of those doctors opining thereon, is an issue reserved to the Commissioner.

Nevertheless, the ALJ's rejection of Dr. Dwivedi's opinion, which also pertained to the assessment of Plaintiff's RFC, was insufficient. The ALJ failed to minimally and adequately articulate his rationale. First, he did not explain why Dr. Dwivedi's acceptance of Plaintiff's subjective complaints was inappropriate. Plaintiff presented evidence from several physicians that established that he in fact had an underlying mental impairment, and even the ALJ found that Plaintiff's affective mood disorder was "severe." (R. at 30.) Under these circumstances, the ALJ cannot dismiss subjective complaints solely because they are not supported by objective evidence. As in *Carradine*, it is possible that Plaintiff's subjective complaints were the only symptoms of his psychiatric condition. Furthermore, psychiatric examinations "will often involve little more than analyzing self-reported symptoms." *Ziegler v. Astrue*, No. 08-3914, 2009 WL 2060111, at *6 (7th Cir. July 7, 2009).

The other physicians' opinions on which the ALJ relied largely analyzed Plaintiff's self-reported symptoms–just as Dr. Dwivedi. Thus, the ALJ treated the analysis of such subjective reports as, in the case of psychiatric examinations, a "medically acceptable" technique. *See* 20 C.F.R. § 404.1527(d). It was, therefore, improper for the ALJ to dismiss Dr. Dwivedi's opinion on that basis while according significant weight to the opinions of other medical sources.

Additionally, in his dismissal of Dr. Dwivedi's opinion, the ALJ merely listed as reasons the general statutory bases for declining to give controlling weight—that is, that Dr. Dwivedi's opinion is not supported by medical evidence and not consistent with other substantial medical evidence in the record. In doing so, the ALJ failed to minimally and adequately articulate his rationale because he did not explain *how* Dr. Dwivedi's opinion is unsupported by, or not consistent with, other evidence. The ALJ briefly summarized the supporting evidence from

Dr. O'Donnell, Dr. Shah, Dr. Buch, and the DDS non-examining medical experts; but he did not include any information from Dr. Dwivedi's assessments before dismissing Dr. Dwivedi's opinion and according significant weight to the other medical opinions.

In fact, with the exception of Dr. Dwivedi's opinion regarding Plaintiff's ability to work, the information in his treatment notes and Mental Disorder Report is not necessarily inconsistent with other medical evidence. There is no disagreement among the physicians that Plaintiff suffered from anxiety and panic symptoms. All physicians also reported that Plaintiff's symptoms are relieved by medication. Each DDS-physician who assessed Plaintiff examined him only once—all within a two-month period and a few months before Plaintiff began seeing Dr. Dwivedi.

These physicians reported that Plaintiff was "mildly anxious" and recorded positive observations about the Plaintiff's demeanor, attitude, behavior, speech, and affect at the time of examination. Dr. Dwivedi's notes show that Plaintiff's symptoms, mood and functioning varied between visits, and there were days when Dr. Dwivedi's observations of Plaintiff corresponded with the observations of the other medical sources. The differences in reported frequency, intensity, and limiting effects of these symptoms do not automatically indicate inconsistency, but instead should be expected in the course of ongoing treatment. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (a claimant suffering from "a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days"). Furthermore, some of Plaintiff's symptoms that were reported only to Dr. Dwivedi, such as obsessive thoughts and the single instance of suicidal ideation, are not directly contradicted by other medical evidence in the record.

The Court further notes that, even if an ALJ does not afford a treating physician's opinion controlling weight, he is still required to determine an alternative weight assignment by considering "length, nature, and extent of the treatment relationship[;] frequency of examination[;] the physician's specialty[;] the types of tests performed[;] and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The single sentence pertaining to Dr. Dwivedi's opinion gives no indication that the ALJ had considered these factors.

In sum, the Court finds that the ALJ was entitled to discount Dr. Dwivedi's opinion on Plaintiff's ability to work, as the determination of statutory disability is reserved to the Commissioner. As to the assessment of Plaintiff's RFC, however, the Court finds that the ALJ failed to minimally and adequately articulate his rationale behind declining to give controlling weight, or any weight, to Dr. Dwivedi's opinion. Therefore, the Court reverses and remands the ALJ's decision.

### B. Step Four Determination

#### 1. Mental Demands of Past Work and Plaintiff's Limitations

Plaintiff contends that the ALJ erred at step four of the disability determination because his decision did not identify the specific mental demands of Plaintiff's past relevant work and subsequently failed to reconcile whether Plaintiff can meet these demands given his limitations. (Pl.'s Mot. 9-10.) To advance his argument, Plaintiff invokes SSR 82-62, which requires the ALJ, in finding that the claimant can perform past work, to make specific findings of fact as to the claimant's RFC, the physical and mental demands of the claimant's past job, and, whether,

given the claimant's RFC, she could return to her past work. *Prince*, 933 F.2d at 602; SSR 82-62 (stating the aforementioned requirements).

At step four, the ALJ may not "describe a claimant's job in a generic way . . . and conclude, on the basis of claimant's [RFC], that she can return to her previous work." *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991). Instead, an ALJ must address the particular requirements of the claimant's past relevant job and compare those requirements with the claimant's existing physical and mental capabilities. *Id.* Furthermore, this assessment must be explicit to allow for meaningful review. *See Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984) (stating that "[the ALJ] may have done [engaged in such a comparison]; but [the appellate court] cannot tell that from his opinion").

In this case, the ALJ found that Plaintiff's symptoms and "impairments significantly limit[ed] [his] physical or mental ability to do work-related activities." (R. at 30.) The ALJ also acknowledged that Plaintiff had moderate difficulties in social functioning, concentration, persistence, or pace. (R. at 30-32.) After considering the evidence in the record, the ALJ found that Plaintiff had the RFC to "perform the full range of light work unskilled 1,2,3-step jobs, limited contact with general public." (R. at 32.) Critically, the ALJ described Plaintiff's past job as a laborer to be "light unskilled work," and found that Plaintiff was "able to perform [such] work as it is actually performed." (R. at 35.) In finding that Plaintiff was capable of performing his past relevant work as a laborer, the ALJ concluded that "[this] work does not require the performance of work-related activities precluded by [Plaintiff's] RFC." (*Id.*)

The ALJ committed an error in describing Plaintiff's past job as a laborer in a very generic manner. "Light unskilled work" was the extent of the ALJ's description of Plaintiff's past

job. Such a perfunctory description does not satisfy the requirement that the ALJ's decision contain a specific finding of fact as to the physical and mental demands of a claimant's past relevant work. Similarly, this Court finds that the comparison between the demands of Plaintiff's past relevant work and his existing capabilities is superficial and insufficient. The only indication that the ALJ made any kind of comparison was the brief statement that Plaintiff's past relevant work "does not require the performance of work-related activities precluded by [his] RFC." The ALJ made no mention of what Plaintiff's past relevant work did specifically require, and consequently failed to assess the compatibility between those requirements and the Plaintiff's existing capabilities.

The Commissioner argues that Plaintiff was asked about the requirements of his past relevant work at the administrative hearing, so that the ALJ was in fact aware of these requirements in making his decision. (Def.'s Resp. 11-12.) SSR 82-62, however, expressly requires that the ALJ's decision state the specific requirements of a claimant's past relevant work and how those compare with the claimant's capabilities. The ALJ may actually have been aware of the job requirements and their compatibility with Plaintiff's capabilities; but this Court cannot determine whether the ALJ actually made this comparison because he failed to explicitly include it in his opinion. Therefore, the ALJ failed to meet the minimum articulation standard and, as a result, did not build an accurate and logical bridge between the evidence and his conclusion. For this additional reason, the Court reverses and remands the ALJ's decision on this issue.

2.    Plaintiff's Residual Functioning Capacity Assessment

Plaintiff also argues that the ALJ erred at step four by failing to make a

function-by-function assessment of his ability to meet the mental demands of work. (Pl's. Mot.

10.) Plaintiff contends that the ALJ was required to make a function-by-function assessment of

basic work-related activities, and that the ALJ failed to do so when he stated his determination of

Plaintiff's RFC. (Pl.'s Mot. 11.) To advance his argument, Plaintiff cites SSR 85-15, which

states that

> [t]he basic mental demands of competitive, remunerative, unskilled
> work include the abilities (on a sustained basis) to understand,
> carry out, and remember simply instructions; to respond
> appropriately to supervision, coworkers, and usual work situations;
> and to deal with changes in a routine work setting. A substantial
> loss of ability to meet any of these basic work-related activities
> would severely limit the potential occupational base. This, in turn,
> would justify a finding of disability because even favorable age,
> education, or work experience will not offset such a severely
> limited occupational base.

SSR 85-15. When assessing a claimant's RFC, an ALJ must consider all medically determinable

impairments, whether physical or mental. *Craft*, 539 F.3d at 676. An ALJ satisfies discussion

requirements pertaining to the RFC assessment by analyzing medical evidence, a claimant's

testimony and credibility, and other evidence. *Knox v. Astrue*, No. 08-3389, 2009 WL 1747901,

at *5 (7th Cir. June 19, 2009). When an ALJ evaluates a claimant's mental limitations under the

Paragraph B criteria[15] and incorporates such an evaluation into the RFC assessment, the ALJ may

---

[15] Paragraph B refers to 20 C.F.R. § 404.1520a(b), which explains the "special technique" used to assess whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *Craft*, 539 F.3d at 674. If the ALJ finds that the claimant has a medically determinable mental impairment, he must rate the degree of functional limitation in the four general areas known as Paragraph B criteria: ADL; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.*

make conclusions, based on that evaluation, regarding the claimant's further work-related mental limitations. *Schmidt*, 496 F.3d at 844. "Although the 'RFC assessment is a function-by-function assessment,' the expression of a claimant's RFC *need not be articulated function-by-function*; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox*, 2009 WL 1747901, at *5 (citation omitted) (emphasis added).

      In this case, the ALJ determined that Plaintiff's severe impairments consisted of "[a]ffective mood disorder and hypertension with no end organ damage." (R. at 30.) Throughout his decision, the ALJ discussed the medical evidence in the record, including the opinions of Dr. O'Donnell, Dr. Shah, Dr. Buch, Dr. Dwivedi, Mays, and the DDS non-examining medical experts (Drs. Cochran and Pilapil). (R. at 30-34.) He also discussed information from forms submitted by Plaintiff to the SSA, as well as Plaintiff's testimony during the administrative hearing. (*Id.*) The ALJ further used the aforementioned evidence in assessing Plaintiff's credibility. (R. at 33-34.) In determining whether Plaintiff's impairments met or equaled a listed impairment, the ALJ considered the Paragraph B criteria and adopted Dr. Cochran's assessment that Plaintiff's mental impairment resulted in moderate restrictions on ADL; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. (R. at 30-32.) The Court is satisfied that the ALJ sufficiently discussed Plaintiff's symptoms and the physicians' medical opinions; therefore, it finds that the ALJ fulfilled discussion requirements pertaining to the RFC assessment.

### 3.   DOT Job Codes and the VE's Testimony

Plaintiff next contends that the ALJ committed reversible error by failing to include the

DOT codes for the jobs identified by the VE. (Pl.'s Mot. 10.) Plaintiff argues that "laborer" is

too broad and may pertain to several possibilities under the DOT. (*Id.*) He further argues that

without the DOT codes, it cannot be determined whether the jobs referenced are compatible with

Plaintiff's functional limitations, or whether there is a conflict between the jobs referenced and

the DOT. (*Id.*) An ALJ who takes testimony from a VE about particular job requirements has an

affirmative duty to ask whether the testimony is consistent with the DOT. *Prochaska v.

Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). This duty is satisfied when the ALJ asked the VE

about consistency after the VE has provided answers to the ALJ. *Plesha v. Astrue*, No. 07-6602,

Slip. Op. at 35-37 (N.D. Ill. Aug. 31, 2009). An ALJ may rely on a VE's testimony over the DOT

if that testimony reflects the nature of a claimant's past relevant work as he actually performed it.

*Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Furthermore, the Seventh Circuit has

"never held" that ALJs are further required to inquire into the specific characteristics of other

jobs that a claimant could perform based on his RFC. *Stark v. Astrue*, 278 Fed. Appx. 661, 667

(7th Cir. 2008).

In this case, the ALJ fulfilled his affirmative duty to ask the VE whether his testimony

was consistent with the DOT, which he did at the conclusion of the VE's testimony. (R. at 542.)

The VE answered in the affirmative, (*id.*), and the ALJ was permitted to rely on this answer in

determining that there was no conflict with the DOT. Furthermore, the VE was present

throughout the entire hearing and heard Plaintiff's testimony regarding his past relevant work.

Therefore, as the Commissioner properly argues, the VE was in a position to testify as to the

nature of Plaintiff's past relevant work as it was actually performed, and the ALJ was entitled to rely on this testimony over information in the DOT. In addition, when the VE referenced *other* jobs that Plaintiff could perform based on his RFC—light assembly; light machine tending; inspecting, checking, and weighing; and light packing—the ALJ had no further duty to inquire into the specific characteristics of those jobs. Since the ALJ did not have such a duty, it was not necessary for him to include the DOT codes for those jobs in his decision.

## IV. Conclusion

For the reasons discussed above, this Court finds that the ALJ was not required to include the DOT codes for the jobs referenced by the VE or a written function-by-function assessment in his decision. On those issues, then, this Court affirms the ALJ. Nevertheless, the ALJ failed to properly articulate his reasoning behind the weight he accorded to Dr. Dwivedi's opinion, and did not sufficiently compare the demands of Plaintiff's past relevant work with his existing mental limitations. On these two issues, the Court reverses the ALJ's decision. Therefore, the Court affirms the Commissioner's decision in part, reverses in part, and remands the case for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: September 16, 2009.            United States Magistrate Judge